IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**CHARLES CORN, JR., a child by,**
**KATHY CORN, as next friend, and**
**KATHY CORN**

       **Plaintiffs,**

v.                    Civ. No. 98-1375 JP/DJS

**RANDY ADRIAN, The Athletic Director**
**and NEIL NUTTAL, Superintendent**
**of the Clovis Municipal Schools, in their**
**individual and official capacities**
**and the CLOVIS MUNICIPAL SCHOOLS,**

       **Defendants.**

## MEMORANDUM OPINION AND ORDER

On August 19, 1999 Defendants filed a Motion to Dismiss Amended Complaint (Doc. No. 10) which will be granted with prejudice with respect to Counts One and Two, and granted without prejudice with respect to Count Three.

**I. Background**

On June 2, 1999 Plaintiffs filed their First Amended Complaint for Damages and Injunctive Relief ("complaint"). They seek relief under 42 U.S.C. § 1983 because of a disagreement over Plaintiff Charles Corn, Jr.'s hair. Plaintiffs specifically allege violations of the First Amendment right to speak without retaliation, Fourteenth Amendment rights to freedom of association and equal protection, and Title IX freedom from retaliation. Plaintiffs do not, however, claim that Defendants' rules and policies on hairstyles for male students are themselves

unconstitutional. See New Rider v. Board of Educ., 480 F.2d 693, 698-700 (10th Cir. 1973) (public school hairstyle regulations requiring short hair for men do not give rise to constitutional claim for male students wishing to wear long hair).

The allegations in the complaint[1] reveal the following scenario: Plaintiffs are residents of Clovis, New Mexico. Plaintiff Charles Corn, Jr. is the son of Plaintiff Kathy Corn. In June, 1999 Plaintiff Charles Corn, Jr. was a sixteen-year-old, tenth-grade student at Clovis High School who previously attended Yucca Junior High School. Both schools are part of the Clovis Municipal Schools ("CMS"). For some if not all of the period discussed in the complaint Plaintiff participated, or attempted to participate, in sports including soccer, track and basketball in class and extracurricularly. Plaintiff Charles Corn, Jr. prefers to wear his hair in a "ponytail" and, during the relevant period, his hair was shoulder- or collar-length or longer.

Plaintiff Kathy Corn filed several complaints, none of which have been provided to the Court, with the Office of Civil Rights ("OCR") due to conflicts with school officials over Plaintiff Charles Corn, Jr.'s hair. A complaint filed on February 18, 1997 ("first OCR complaint") stated that on October 31, 1996, Plaintiff Charles Corn, Jr. "was denied participation in a graded physical education class at Yucca Junior High School." Complaint ¶ 14a.[2] On November 11,

---

[1] The complaint is sloppily written. It is poorly organized and so inconsistent as to render a full and accurate chronology impossible.

[2] The complaint does not indicate who denied Plaintiff Charles Corn, Jr. participation, or what the proffered or perceived reason for that denial was, other than to state that Plaintiff Charles Corn, Jr.'s parents advised Defendant Adrian of "possible violations of Title IX." Complaint ¶ 14c. The factual portion of the complaint does not discuss Plaintiff Charles Corn, Jr.'s hairstyle until page nine, see id. ¶ 20a, and does not explicitly mention retaliation until page fourteen, see id. ¶ 34(first). Both references apparently relate to events other than those of October 31, 1996.

2

1996 Plaintiff Charles Corn, Jr.'s parents met with Defendant Adrian to discuss the denial of the right to participate. Defendant Adrian told them athletics were a privilege, not a required course. Plaintiff Kathy Corn later met with Mr. Mestas, the Assistant Superintendent of Personnel for CMS. He told Plaintiff Kathy Corn that he would look into her complaint and respond in several months. On November 22, 1996 Plaintiff Kathy Corn wrote to all members of the CMS "Board of Directors,"[3] relaying her concern about the Code of Ethics under which her son had been disciplined. Id. ¶ 14f. She received no response. On January 30, 1997 Plaintiff Charles Corn, Jr.'s parents met with Defendant Adrian and Mr. Mestas who issued them a "revised" Code. Id. ¶ 14h. The new Code did not address Plaintiffs' concerns about arbitrary and discriminatory decisions by athletics instructors. Mr. Mestas also felt that the new Code applied only to student athletes and not to the physical education curriculum.

The first OCR complaint went on to allege that after Mr. Mestas canceled a scheduled meeting with Plaintiff Kathy Corn, he met with her again on February 3, 1997 and asked Plaintiff Kathy Corn if allowing Plaintiff Charles Corn, Jr. to be in athletics would resolve her concerns. She said no. She then presented Mr. Mestas with "a signed, formal complaint"[4] alleging Title IX violations. Id. ¶ 14k. Mr. Mestas appeared unfamiliar with Title IX. On February 4, 1997 in response to inquiries as to how her complaint would be handled, "Mr. Mitchell"[5] told Plaintiff Kathy Corn to follow the procedure which is used to respond to ADA complaints. Id. ¶ 14m.

---

[3] Presumably this reference is to the school board or board of education.

[4] Presumably this reference is to the first OCR complaint, which Plaintiff Kathy Corn later filed with OCR on February 18, 1997.

[5] Plaintiffs do not identify Mr. Mitchell's title or position.

Plaintiff Charles Corn, Jr. is not disabled.

On September 13, 1997 Plaintiff Kathy Corn filed another OCR complaint ("second OCR complaint").[6] She alleged CMS discriminated against her son by retaliating, intimidating and harassing him through "various bad-actor employees." Id. ¶ 34(first). She specifically claimed that CMS discriminatorily imposed different dress and appearance requirements for males and females, that Plaintiff Charles Corn, Jr. wore a "non-male" haircut, that his peers and coaches humiliated him so that he considered not participating in athletics, and that he wore a ponytail to keep his hair restrained and under control so as not to impair his ability to be a soccer, track and basketball athlete.

Also in the second OCR complaint, Plaintiff Kathy Corn contended that in October, 1996, during try-outs for the Yucca Junior High basketball team, Plaintiff Charles Corn, Jr. was obliged to sign a Code of Ethics requiring him to wear his hair "neat to the coach's specifications." Id. ¶ 34g. Coach Crisp told Plaintiff Charles Corn, Jr. and all the players that short haircuts and no ponytails would be the order. Plaintiff Charles Corn, Jr. was the only male present with a ponytail. Plaintiff Charles Corn, Jr. made the team but was told that if he wanted to play he could not wear a ponytail and must cut his hair. Coach Smith told Plaintiff Charles Corn, Jr. to choose between his hair and basketball. Plaintiff Charles Corn, Jr. cut his hair one inch and had his curly hair chemically straightened. In November, 1996 Coach Casaus attempted to bet Plaintiff Charles Corn, Jr. on Plaintiff Kathy Corn's ability to change the hair code. Plaintiff Charles Corn, Jr. also

---

[6] Paragraph 15 states that Plaintiff Kathy Corn also filed an OCR complaint on February 21, 1997. It does not indicate the content or allegations of that complaint however. Hence, the OCR complaint filed September 13, 1997 is referred to as the "second OCR complaint," although under the Plaintiffs' confusing allegations, it technically may have been the third OCR complaint filed.

participated in track and athletics class during which he wore a ponytail without incident.[7]

The second OCR complaint also alleged that on September 12, 1996 Plaintiff Kathy Corn told Mr. Mestas that the athletics department seemed ignorant of the new hair code which allowed for collar-length hair. In that conversation she also shared with Mr. Mestas a rumor that the varsity boys' soccer team intended to forcibly trim Plaintiff Charles Corn, Jr.'s hair while on an overnight trip to Albuquerque. Plaintiff Kathy Corn said that "such an assault had better not happen." Id. ¶ 34*l*. Mr. Mestas asked whether "this is a threat or do you want me to do something about it." Id. Plaintiff Kathy Corn also maintained that Defendant Adrian in printed media referred to Plaintiff Charles Corn, Jr. as a "Dennis Rodman clone." Id. ¶ 34m.

Plaintiff Kathy Corn filed another OCR complaint ("third OCR complaint") on September 15, 1997, claiming gender-based discrimination and retaliatory conduct taken against Plaintiff Charles Corn, Jr.[8] This third OCR complaint stated that in October, 1996 "Coach Tixier"[9] told Plaintiff Charles Corn, Jr. that he could not wear a ponytail and that he must trim his hair. Id. ¶ 20a. Through November, 1995 to February, 1996, Plaintiff Charles Corn, Jr. complied by not

---

[7] Plaintiffs do not state specifically the dates that Plaintiff Charles Corn, Jr. participated in sports other than basketball without a problem. This allegation is made between paragraphs describing incidents that occurred in October and November, 1996. The clear implication is that Plaintiff Charles Corn, Jr. freely participated during that same period in other activities while wearing a ponytail. Yet at Paragraph 20f Plaintiffs state "[t]hroughout March, 1996 and until the end of June, 1997, track coaches at Yucca Junior High School strictly enforced the no ponytails for boys rule against Charles Corn, Jr. . . . ."

[8] Plaintiffs' restatement of the third OCR complaint in the allegations of their complaint filed in this federal court action describes an impossible chronology. The dates Plaintiff alleged in reference to the third OCR complaint are reproduced in this Memorandum Opinion and Order without speculation as to where the errors lie.

[9] The following paragraph refers to "Coach Tixler." Complaint ¶ 20b.

5

wearing a ponytail during athletics class or during extracurricular activities. This September 15, 1997 third OCR complaint also alleged that on October 27, 1997 Coach Smith told all students trying out for boys basketball that hair must be cut above the ears and that no ponytails would be allowed. In the September 15, 1997 third OCR complaint Plaintiff Kathy Corn also contended that on Ocotober 31, 1997 Plaintiff Charles Corn, Jr. was "denied opportunity to participate in athletics because of nonconformance with the hair intolerance policy." Id. ¶ 20d.

Plaintiff Kathy Corn also contended in the third OCR complaint that, in a February 13, 1997 letter, Mr. Mestas urged Plaintiff Kathy Corn to support the new Code of Conduct, apparently later approved March 5, 1997 because of Plaintiff Kathy Corn's concerns. The new Code prohibited ponytails for men, in violation of Title IX, Plaintiff Kathy Corn claimed. From March, 1996 through June, 1997, Plaintiff Charles Corn, Jr. was required to remove his hair from a ponytail before class, during extra-curricular activities, while riding the bus, during meals and while passing the locker room door. Track coaches ensured that Plaintiff Charles Corn, Jr. did not restore his ponytail until he left the locker room.

The third OCR complaint also alleged that on April 10, 1997 Plaintiff Charles Corn, Jr. wore his hair in braids, without a ponytail restraint. At approximately the second hour of classes, Defendant Adrian told Plaintiff Charles Corn, Jr. that braided hair was unacceptable for eighth-grade male students. In spite of a previous agreement to contact Plaintiff Kathy Corn if there was ever a problem with Plaintiff Charles Corn, Jr.'s hair, Mr. Mestas did not do so. When Defendant Adrian did inform Plaintiff Kathy Corn of his views about Plaintiff Charles Corn, Jr.'s braids, she reminded him that several ninth-grade male students were permitted to wear braids.

On September 17, 1997 Plaintiff Kathy Corn filed another complaint ("fourth OCR

complaint"). In it she alleged that CMS maintained sex-segregated physical education classes at the junior high level and athletics classes for credit at the senior-high level. At the junior- and senior-high levels female athletes are subject to disparate treatment.

The complaint in this case incorporates the OCR complaints and adds the following: On April 4, 1997 Plaintiff Charles Corn, Jr. was made to clean up the team bus at 1:30 a.m. as punishment for wearing a ponytail on the bus and during the last event of the day and/or for wearing a ponytail in the locker room. On April 14, 1997 Plaintiff Charles Corn, Jr. was suspended from an upcoming meet, in further punishment for violating the hair rules. On June 5, 1997 the OCR advised Plaintiff Kathy Corn that it had entered into a Commitment to Resolve based upon her "complaint of February 21, 1997." Id. ¶ 15.

Another Commitment to Resolve was entered September 12, 1998.[10] On September 25, 1998 Defendant Adrian recommended to Coach Gonzales that Plaintiff Charles Corn, Jr. be suspended from the next day's soccer game for wearing his hair in a ponytail at a pep rally. Defendant Adrian also recommended that a second violation result in dismissal from the team. Coach Gonzales gave Plaintiff Charles Corn, Jr. a one-game suspension. Defendant Nuttal upheld the suspension and supported Defendant Adrian. During a soccer banquet, Plaintiff Charles Corn, Jr. was ordered to remove his hair from a ponytail although he was wearing a suit and was accompanied by a date.

"Team Sport Athletics" are part of a student's graded curriculum and grade point average. Id. ¶ 11. Both Plaintiffs are aware of other male students in New Mexico, in and out of CMS,

---

[10] Plaintiffs state Plaintiff Kathy Corn filed three OCR complaints, two of which resulted in formal conciliation agreements.

who wear braids, ponytails, pigtails and dreadlocks during sports.

**II.    Discussion**

Defendants move to dismiss under Fed. R. Civ. P. 12(b)(6) on the following grounds: Plaintiffs fail to allege any basis for CMS liability,[11] fail to state an associational claim, fail to state claims for retaliation under the First Amendment and Title IX, and fail to state an equal protection claim.  Defendants also allege they are qualifiedly immune from all claims.

In considering a motion under Fed. R. Civ. P. 12(b)(6) to dismiss for failure to state a claim, the court must liberally construe the pleadings, accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  See Swanson v. Bixler, 750 F.2d 810, 813 (10th Cir. 1984).  A complaint may be dismissed only if it appears to a certainty that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Thus, all well-pleaded facts, as distinguished from conclusory allegations, must be taken as true.  See Swanson, 750 F.2d at 813.

However, a defendant who raises a qualified immunity defense triggers, in some circumstances, a heightened pleading standard in order to minimize disruption of effective government.  See Breidenbach v. Bolish, 126 F.3d 1288, 1292 (10th Cir. 1997) (dismissing without prejudice and with leave to amend).  Certain plaintiffs against whom a defendant claims qualified immunity must include in their complaint "all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." Sawyer v. County of Creek, 908 F.2d 663, 667 (10th Cir. 1990) (dismissing with prejudice where plaintiff could not amend complaint without discovery); cf. Leatherman v. Tarrant County Narcotics Intelligence and

---

[11] Plaintiffs concede in response that they make no section 1983 claims against CMS.

Coordination Unit, 507 U.S. 163, 166-68 (1993) (rejecting heightened pleading standard in section 1983 cases against municipalities, declining expressly to consider whether heightened pleading appropriate against "individual government officials"); Breidenbach, 126 F.3d at 1292 n.2 (recognizing Leatherman did not address heightened pleading against "individual government officials," requiring heightened pleading in Bivens action against government agent in his official capacity).

### A. Count I

Plaintiffs complain that Defendants hindered their right to familial association *inter se*. They maintain that Defendant Adrian and other sports coaches, all employed by CMS, humiliated Plaintiff Charles Corn, Jr. by constantly reminding him of the ponytail problem and keeping him from full participation in athletics.

To state a claim that Defendants deprived Plaintiffs of their constitutional right to familial association, Plaintiffs must plead that Defendants acted with the intent to deprive Plaintiffs of that right. See J.B. v. Washington County, 127 F.3d 919, 927 (10th Cir. 1997); Trujillo v. Board of County Comm'rs, 768 F.2d 1186, 1190 (10th Cir. 1985). Not every resulting interference is actionable. See Griffin v. Strong, 983 F.2d 1544, 1548 (10th Cir. 1993).

Implicit in the cases is the requirement that Plaintiffs plead actual impairment of the familial relationship. While Plaintiffs claim interference, they do not state how. Plaintiffs make allegations that Defendants harassed and humiliated Plaintiff Charles Corn, Jr. Although disturbing if true, these allegations do not necessarily impair the mother-son relationship.

Even assuming Plaintiffs have shown harm, they have not met the specific intent pleading standard. The plaintiffs in Trujillo, the mother and sister of an inmate, claimed that conduct

resulting in the wrongful death of the inmate led to a deprivation of their right to familial association. See Trujillo, 768 F.2d at 1188. Recognizing that the complaint "alleges intent with respect to [the inmate's] rights," the complaint was not sufficient to state a claim that the defendants acted with the intent to deprive the plaintiffs of a protected relationship. Id. at 1190.

The complaint in this case, including those portions to which Plaintiffs draw attention, does not reveal that Defendants acted with the intent to adversely affect Plaintiffs' familial relationship. While the whole of the complaint alleges intent to retaliate against Plaintiff Charles Corn, Jr. for Plaintiff Kathy Corn's actions, such intent should not transfer among causes of action just as it did not transfer among individuals in Trujillo. Thus, Plaintiffs fail to state a claim for a violation of the right to freedom of familial association because they do not show that Defendants acted for the specific purpose of adversely affecting the relationship between Plaintiffs. Accordingly, I do not reach the question of whether the law was clearly established so as to entitle Defendants to qualified immunity.

### B.   Count II

Count Two contains the following incomprehensible heading, verbatim:

> RETALIATION FOR FILING COMPLAINT WITH OCR
> FIRST AMENDMENT VIOLATION
> AND VIOLATION AND TITLE IX

Complaint at 19.  The text of Count Two alleges that Defendants carried out various acts against Plaintiff Charles Corn, Jr. in retaliation for Plaintiff Kathy Corn's complaints to CMS and OCR, alleging Title IX violations, and that Defendants attempted to chill Plaintiff Kathy Corn's First Amendment speech by harassing her son.  Defendants read Count Two to allege claims for retaliation in response to the exercise of First Amendment and Title IX rights, and move to dismiss each.[12]

The First Amendment protects the right to petition for the redress of grievances.  See Martin v. City of Del City, 179 882, 886-87 (10th Cir. 1999).  In this case, there are no allegations that Defendants abridged Plaintiff Charles Corn, Jr.'s First Amendment rights. Plaintiffs assert a violation of Plaintiff Kathy Corn's First Amendment rights through actions taken against her son.  Plaintiff Charles Corn, Jr. cannot press a claimed violation of his mother's constitutional rights.  See Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir. 1990) ("[K]eep firmly in mind the well-settled principle that a section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else."); K.U. v. Alvin Indep. Sch. Dist., 991 F.Supp. 599, 607 (S.D. Tex. 1998) (dismissing plaintiff's section 1983 claim for retaliation

---

[12] In spite of Defendants' one-and-a-half page, appropriately labeled argument that Plaintiffs' did not state a valid retaliation claim under the First Amendment, Plaintiffs argue that Defendants failed to challenge Plaintiffs' First Amendment claim.  Plaintiffs contention is incorrect.  Any First Amendment claim Plaintiffs have tried to allege includes an allegation of a violation of that right by retaliation, which Defendants clearly addressed.

against him caused by his mother's exercise of her free speech rights where mother not an idividual plaintiff). Thus, any First Amendment claim must be Plaintiff Kathy Corn's for violation of her own free speech rights.

Punishing Plaintiff Charles Corn, Jr. for his mother's speech would chill her right to speak. See Hicks v. City of Watonga, 942 737, 743-44 (10th Cir. 1991) (threatening to fire plaintiff's girlfriend because plaintiff filed a grievance with girlfriend's employer would be improper). Plaintiffs, however, have failed to allege a vital causal link. See Wolford v. Lasater, 78 F.3d 484, 488 (10th Cir. 1996) (suggesting "key question" in a section 1983 case is whether retaliation for the exercise of First Amendment rights was the "cause" of injuries to plaintiff).

Paragraph 34*l* of the Complaint indicates that on September 12, 1996 Plaintiff Kathy Corn told Mr. Mestas that "the athletics department" seemed ignorant of a policy that allowed for collar-length hair and about her concern that the varsity boys soccer team would forcibly trim her son's hair. See Complaint ¶ 34*l*. From this allegation one may infer that a school official, probably a soccer coach, had at least attempted to enforce school policy against Plaintiff Charles Corn, Jr. at a time prior to Plaintiff Kathy Corn speaking with someone from CMS on September 12, 1996.[13] In October, 1996, through one or more basketball coaches, CMS again enforced the hair policy against Plaintiff Charles Corn, Jr. See Complaint ¶¶ 14a, 20a, 34f,j. Plaintiff Kathy

---

[13] Paragraph 20f states that as early as March, 1996 Yucca Junior High track coaches enforced the no-ponytail rule. This date significantly precedes any protected speech by Plaintiff Kathy Corn. However, viewing the facts in a light most favorable to Plaintiffs, I will not consider this contradicted date. See supra note 7.
    Paragraph 20b states that the policy may have been enforced against Plaintiff Charles Corn, Jr. as early as November, 1995. Again, viewing the facts in a light most favorable to Plaintiffs, I will not consider that November, 1995 date because the surrounding paragraphs strongly suggest that it is a typographical error.

Corn launched her protests almost immediately thereafter. During the thick of Plaintiff Kathy Corn's actions, CMS evidently refined the hair code and/or reduced it to writing, but the Plaintiff's allegations do not show that enforcement against Plaintiff Charles Corn, Jr. ever varied because of Plaintiff Kathy Corn's complaints.

Plaintiffs have alleged that in February, 1997 Mr. Mestas asked "whether allowing Plaintiff Charles Corn, Jr. to be in athletics would resolve her concern." Id. ¶ 14k. Plaintiff Kathy Corn declined the offer. Even if the implication (far from clear) is that Defendants would cease enforcing the hair policy against Plaintiff Charles Corn, Jr. by allowing him to take part in sports while wearing a ponytail in exchange for Plaintiff Kathy Corn's silence, no First Amendment retaliation claim is made.

"[A]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." Gehl v. Koby, 63 F.3d 1528, 1534 (10th Cir. 1995) (citing DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990). Gehl involved a criminal prosecution begun because of the plaintiffs' exercise of the First Amendment right to solicit charitable contributions.[14] See Gehl, 63 F3d at 1534-36. DeLoach involved the prosecution of a criminal defendant because of that defendant's decision to hire a lawyer.[15] See DeLoach 922 F.2d at 620. In neither of those cases,

---

[14] The Tenth Circuit found that the plaintiffs failed to meet their burden under the qualified immunity doctrine to establish that the defendants acted to violate the First Amendment with a culpable state of mind. See Gehl, 63 F.3d at 1536. Even if Plaintiffs in this case succeeded to state a claim under Count Two, they have not met the qualified immunity standard. Defendants' offer to allow Plaintiff Charles Corn, Jr. to participate in athletics, which Plaintiff Kathy Corn rejected, reflects a laudable attempt to resolve the dispute without litigation, not a guilty mind.

[15] The Tenth Circuit found that the unlawful intent in such retaliation placed it well beyond the scope of any qualified immunity. DeLoach, 922 F.2d at 620.

13

however, was the otherwise proper enforcement of legitimate laws undertaken *before* the protected action, in contrast with this case. Defendants had a right to enforce the hair policy, and were doing so, both before and after Plaintiff Kathy Corn spoke out.

Plaintiffs Title IX retaliation claim fails for the same causation reasons noted above with respect to their First Amendment retaliation claim. Accordingly, I do not reach Defendants' argument that there is no cause of action against the individual defendants under Title IX.

**C.     Count III**

Count Three is a challenge to the application of CMS hair regulations. Plaintiffs specifically allege in Count Three that Defendant Adrian "selectively enforc[ed]" the "facially general Code of Conduct" in an "arbitrary and capricious manner" in violation of the Equal Protection Clause. Complaint ¶¶ 63-64. Plaintiffs then explain by claiming that other student athletes competed while wearing ponytails, braids or hair restraints.

The Equal Protection Clause prohibits the government from treating similarly situated individuals differently when the dissimilar treatment involves a fundamental right or a suspect classification. See Jacobs, Visconsi & Jacobs v. City of Lawrence, 927 F.2d 1111, 1119 (10th Cir. 1991). It also bars dissimilar treatment where the classification is not based on a suspect class or a fundamental right and the distinction lacks a reasonable basis. See id.[16] In either instance, however, whether a plaintiff is similarly situated to others who are treated differently amounts to a threshold inquiry. See Gehl, 63 F.3d at 1538.

Jacobs illustrates the analysis. In that case, the plaintiffs sought to develop land on the

---

[16] Plaintiffs state that their association and First Amendment claims are "separately pressed." Memo. in Opp. to Def'ts' Mot. to Dismiss at 14 n.3. Both parties urge that the rational basis standard should apply.

outlying reaches of town. See Jacobs, 927 F.2d at 1114. After the city denied their proposal to rezone a suburban area because it would undermine the city's plan to revitalize downtown, the plaintiffs filed an equal protection claim. See id. The Tenth Circuit held that the plaintiffs sufficiently alleged that other entities desiring to develop in and around the city were similarly situated to the plaintiffs, but received unequal treatment based solely upon the location of the proposed development. See id. at 1118-19. The distinctions did not involve a suspect class or a fundamental right, so the different treatment of similar developers needed only to have a rational basis. See id. at 1119. The Tenth Circuit found that the city had a reasonable interest in its plan for the downtown area and declining to grant the plaintiffs' application was rationally related to that interest. See id.

Defendants move to dismiss on the ground that Plaintiffs fail to allege facts showing that similarly situated individuals were treated differently. To indicate Plaintiff Charles Corn, Jr. has not shown that others were similarly situated to himself, Defendants rely on Trujillo v. Sanchez, No. 95-2084, 1996 WL 32138 (10th Cir. Jan. 29, 1996) (unreported case). In that case, the plaintiff, a New Mexico Highlands faculty member, claimed the university denied him equal protection of the laws when it granted him tenure on the condition that he take a leave without pay to earn his Ph.D. See id. at **1. He claimed that he was similarly situated to other faculty members at the same university, in and out of the plaintiff's department. See id. at **2. These individuals, like the plaintiff, did not yet have a Ph.D. and were awarded tenure. See id. Unlike the plaintiff, they were allowed to continue working for the university as they pursued their doctoral degrees. See id. The Tenth Circuit held that the plaintiff failed to allege that the same decision-maker was involved in the other faculty members' cases. See id. The plaintiff's equal

15

protection claim thus failed because he did not show he was similarly situated to these other faculty members. See id.

Also instructive is Tonkovich v. Kansas Board of Regents, 159 F.3d 504 (10th Cir. 1998). In that case the plaintiff, a law professor, claimed the university violated his rights to equal protection when it dismissed him for dating a student. See id. at 533. The Tenth Circuit found that his claim failed because he did not allege that others were similarly situated to him. See id. at 534. The Court of Appeals held that because he was charged with engaging a student in a discussion of grades and then having sex with her, he would need to allege that other professors who had sex with a student in a exploitive manner were not treated the way the university treated the plaintiff. See id.

Plaintiffs in this case have made a substantial but conclusory claim of an equal protection violation by alleging dissimilar treatment that lacks a rational basis. The factual support for these allegations is difficult to discern. At paragraphs 20j and 22 of their complaint, Plaintiffs have pled knowledge of other male students who, like Plaintiff Charles Corn, Jr., wear braids and/or ponytails. Plaintiffs did not allege that these other student athletes are governed by the same CMS hair regulations or that the decision-makers who enforce them were the same persons who have disciplined Plaintiff Charles Corn, Jr., so Plaintiffs did not plead that Plaintiff Charles Corn, Jr. was similarly situated to them. At paragraphs 23 and 65, Plaintiffs have pled that other CMS students competed in track, soccer and other sports while wearing braids, ponytails or hair restraints, but did not allege that these students were male. Plaintiffs thus did not plead that Plaintiff Charles Corn, Jr. was similarly situated to them. Plaintiffs have also not alleged that other similarly situated students were treated differently, i.e., that similarly situated male student

16

athletes with braids or ponytails were not punished. Therefore, Plaintiffs' equal protection claim will be dismissed without prejudice and Plaintiffs will be given an opportunity to file an amended complaint as to their equal protection claim by not later December 23, 1999.[17]

In an amended complaint Plaintiffs must articulate clearly and specifically how they state an equal protection claim. Plaintiffs must plead, *inter alia*, how and when the claim arose, with whom Plaintiff Charles Corn, Jr. was similarly situated and how he was treated differently. Defendants have claimed qualified immunity, so in addition to alleging that Defendants violated a constitutional right, Plaintiffs must show that Defendants' treatment of Plaintiff Charles Corn, Jr. violated clearly established law. See, e.g., Johnson v. Martin, __ F.3d ___, No. 96-CV-536-B, 1999 WL 988554, at *7 (10th Cir. Nov. 1, 1999); Breidenbach, 126 F.3d at 1293; Norton v. Village of Corrales, 103 F.3d 928, 933 (10th Cir. 1996). Plaintiffs should also consider whether any heightened pleading standard is triggered in this case by Defendants' claim of qualified immunity. See Leatherman, 507 U.S. at 166-68. Finally, if Plaintiffs decide to file an amended complaint asserting an equal protection claim, they must, of course, conform to Fed. R. Civ. P. 11.

---

[17] In light of this disposition, I will not reach Plaintiffs' request to strike portions of Defendants' briefs which refer to Trujillo v. Sanchez.

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Amended Complaint (Doc. No. 12) is GRANTED with respect to Counts One and Two, which are dismissed with prejudice, and also with respect to Count Three, which is dismissed without prejudice, with leave to amend by not later than December 23, 1999.

_____
**UNITED STATES DISTRICT JUDGE**